[Civ. No. 9715.   Third Dist.   Jan. 5, 1960.]

A. D. SCHMIDT, Respondent, v. WATERFORD WINERY, LTD. (a Corporation), Appellant.

DELBERT M. FUNK, Respondent, v. WATERFORD WINERY, LTD. (a Corporation), Appellant.

Glicksberg, Glicksberg & Goldberg and Lawrence Goldberg for Appellant.

Elmer L. Winger for Respondent.

SCHOTTKY, J.—Waterford Winery, Ltd., a corporation, appeals from separate money judgments, one in favor of A. D. Schmidt, and the other in favor of Delbert M. Funk, in actions in which Schmidt and Funk sought an accounting in order to determine the amount due them for grapes sold by them to the defendant winery.

In 1951 both Schmidt and Funk sold grapes to the winery. By the terms of the contract the wine made from the grapes

was to be pooled with other wine. When the pooled wine was sold the seller of the grapes was to be paid for the grapes. The amount of payment was determined by a rather complicated formula which is not relevant to the issues here. The winery agreed ''to sell the wine in available wine markets at best prices obtainable under existing market conditions at the time of sale, all in the discretion of the Buyer [the winery], who shall not be held responsible for any fluctuations in the market price of wine or for not selling same at a higher or the highest price at any given time.''

On January 31, 1952, Waterford sent a letter to the grape growers in which it was stated that if the wines were sold at that time nothing would be left for the growers after deducting advances. Waterford suggested that it would be wise to wait.

On February 3, 1953, Waterford advised the growers that the pool wine had been sold as of December 31, 1952, for $32\frac{1}{2}$ cents per gallon. The wine was sold to Eastern Wine Corporation, a company owned by the same two stockholders who owned Waterford. The same man was president of both corporations. Eastern is in the business of selling wine. During a 21-month period 85.9 per cent of the wine produced by Waterford was shipped pursuant to Eastern's directions. The sale was consummated by means of a book entry on Eastern's books crediting the debit balance of Waterford. The wine was actually delivered from January 5, 1953, through September 3, 1953. At the price received from the sale the growers, here Schmidt and Funk, actually owed Waterford money because the advances made to them exceeded their percentage of the sum realized from the sale. The amount received would have been considerably under the market price of the grapes at the time they were purchased by Waterford. After receiving the statements from Waterford showing the amounts allegedly due, Funk and Schmidt each brought an action for an accounting. The cases were consolidated for trial.

At the trial it was disclosed that the 1952 crush was about 400,000 tons (42,000,000 gallons) less than the crush of the previous year. There was testimony that the probable price trend can be determined from the crush. The price at which the wine was sold was the lowest point in the price cycle. The trial judge in his memorandum of decision stated that the sale from Waterford to Eastern was not made in good faith.

The accounting was submitted to a referee who was a certified public accountant. The referee made an analysis and summary of sales from January 1, 1952, until July 31, 1954.

He concluded the pool should be terminated at the latter date as only 950 gallons remained unsold. He made a determination of the market price of the wine when it was actually shipped by Waterford and determined the growers' interest on the theory that the pool wine was a percentage of the total wine shipped. This would have resulted in a net proceed to all the growers of between $25,354.25 and $28,084.53, depending whether or not the high or low market price had been received. Schmidt's share would have been between $1,938.94 and $2,686.71 after deducting the advances and Funk's share between $464.75 and $800.98 after deducting the advances. The trial court, except for minor adjustments, adopted the referee's high figures and awarded judgments in favor of the growers. The trial court also awarded interest on the amounts determined to be due from July 31, 1954, which was some four years prior to the time the judgment was entered in these causes.

The basis of the court's decision is expressed in its memorandum opinion as follows:

"The whole transaction appears to this Court to have been phony. Lefcourt, as President and majority owner of the Waterford Winery, purported to sell the entire pool wine to himself as President and majority owner of Eastern Wine Corporation on December 31, 1952, when the price was at its lowest ebb. He proposed to pay off the grower pool members on this basis; and then, as the Eastern Wine Corporation, he sold the wine on the rising market of 1953 and 1954. In other words, the growers got the short end of the stick, and Lefcourt got the profits.

"Inasmuch as the pooling arrangement, in the opinion of the Court, constituted a trust relationship between Lefcourt and the pool growers, the Court cannot allow Lefcourt, as trustee (Waterford Winery), to deal with himself as the Eastern Wine Corporation to the detriment of the growers.

"The same result would follow, of course, if the relation between the parties was that of principal and agent, or principal and factor."

The principal contention of appellant in arguing for a reversal of the judgment is stated in its opening brief as follows:

". . . [T]he basic contention made by Waterford is that under the pool contract it had the sole discretion as to when to sell the pool wine; that Waterford in good faith made a sale of the pool wine to Eastern at a time when it felt that

it was advisable to sell, and at a time when Waterford was selling its own wine at the same price as that received for the pool wine; that Waterford received the best price obtainable for the wine at the time of the sale, which price was undisputably the fair market price, and therefore, there was no ground upon which the trial Court could possibly disregard the sale from Waterford to Eastern.''

No citation of authority is necessary to support the rule that a trustee or agent may not deal with himself to the detriment of his beneficiary or principal. It is clear also that while under the pooling agreement appellant winery had the sole discretion as to when to sell the pool wine, it was implied in the agreement that it would use good faith. The provision in the contract that the winery would not be held responsible for not selling the wine at a higher price could not give the winery carte blanche authority. Waterford in selling the wine was acting in a fiduciary capacity. It had to act for the best interests of all of the members of the pool. If it sold at a time when higher prices were in the offing, it would not be acting in accord with its duty. It is rather strange that the sale which was purportedly made on December 31, 1952, was not disclosed to the pool members until 30 days later.

As hereinbefore set forth, the wine was sold to Eastern Wine Corporation, a company owned by the same two stockholders who owned appellant Waterford Winery. The same man was president of both corporations. The statements of appellant winery's general manager, Max Goldman, and its president, Lefcourt, under cross-examination, on how this purported ''sale'' was handled are significant.

Mr. Goldman, under questioning, testified as follows:

''MR. WINGER: Q. Am I to take it then, from your testimony, that there was no physical sale of growers' wine by any pinpointing of any one wine that was sold as growers' wine? A. I believe that is correct. The sale is actually handled as a matter of an accounting procedure. . . . Q. Now, Mr. Goldman, when as an accounting procedure was the wine of these pool members sold in 1952? A. It was sold as a matter of accounting procedure December 31, 1952. . . . THE COURT: Now, let me get that so there isn't any question about it. Do I understand your testimony, Mr. Goldman, there, that the—— THE WITNESS: The pool was closed.

.  .  .  .  .  .  .  .  .  .  .  .  .

''THE COURT: All right, now, as I got the question, was whether the 121,000 gallons, the pool wine, was sold in De-

cember, 1952? THE WITNESS: As a matter of bookkeeping it was sold in December, 1952, and the growers credited as the wine had been sold. MR. WINGER: Q. It wasn't sold, Mr. Goldman, as a practical matter of physical delivery and transfer? A. From a co-op standpoint, it was sold. THE COURT: Never mind from a co-op standpoint. That's what I want to know and Mr. Winger has a right to find out, whether this 121,000 gallons—— THE WITNESS: It was physically not sold, no. MR. WINGER: All right, that's the answer I wanted."

Appellant winery's president, Lefcourt, also openly admitted under cross-examination that as of December 31, 1952, none of the pool wine had actually been physically transferred, but that it was physically transferred from January 5, 1953, through September 3, 1953. He further admitted that the transaction was accomplished by means of a book entry of December 31, 1952, in the amount of $39,484.58 on Eastern's books, credited to Waterford Winery to "pay" for the wine against a balance due Eastern.

In view of the evidence in the record we are convinced that the conclusion of the trial court that the asserted sale to Eastern Wine Corporation on December 31, 1952, was not in good faith finds ample support in the record.

Appellant contends further that "there is no basis for charging Waterford with the maximum market prices, as did the referee in his report." As hereinbefore set forth, the referee made a determination of the market price of the wine when it was actually shipped by Waterford and determined the growers' interest on the theory that the pool wine was a percentage of the total wine shipped. This would have resulted in a net proceed to all the growers of between $25,354.25 and $28,084.53, depending whether or not the high or low market price had been received. Schmidt's share would have been between $1,938.94 and $2,686.71 after deducting the advances and Funk's share between $464.75 and $800.98 after deducting the advances. The trial court, except for minor adjustments, adopted the referee's high figures and awarded judgments in the growers' favor.

In view of the fact that the court was justified under the evidence in concluding that the asserted sale on December 31, 1952, was not in good faith, we believe that whether the high or low market price on the dates the wine was shipped by appellant from the pool should be allowed to respondents was a question of fact for the trial court.

The final contention of appellant is that respondents

Schmidt and Funk are not entitled to any interest prior to judgment herein. This contention must be sustained.

■ " '. . . The general rule with respect to allowance of interest, when there is no contract to pay interest, is that the law awards interest upon money from the time it becomes due and payable, if such time is certain and the sum is certain or can be made certain by calculation. (*Cox* v. *McLaughlin,* 76 Cal. 60 [18 P. 100, 9 Am.St.Rep. 164] ; *Gray* v. *Bekins,* 186 Cal. 389 [199 P. 767] ; *Perry* v. *Magneson,* 207 Cal. 617 [279 P. 650].) . . .' " (*Union Sugar Co.* v. *Hollister Estate Co.,* 3 Cal.2d 740, 754 [47 P.2d 273].)

A case very similar to the instant case is *Coghlan* v. *Quartararo,* 15 Cal.App. 662, in which the court said at page 669 [115 P. 664] :

"Appellant's contention that the court erred in allowing interest on the amount due the Swett-Davenport Lumber Co. prior to the judgment must be sustained. This plaintiff sold at the market rates, which changed from time to time, and were the subject of proof at the trial. The amount due was unliquidated, and was not capable of being made certain by calculation. It only became certain when fixed by the judgment. Interest in such a case cannot be allowed prior to judgment. (*Burnett* v. *Glas,* 154 Cal. 249 [97 P. 423].)"

Section 3287 of the Civil Code provides in part that "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day. . . ." The rule is that interest may be awarded where the amount due is certain from the face of the contract or which might be made certain by reference to well-established value plus computation. (*Lineman* v. *Schmid,* 32 Cal.2d 204 [195 P.2d 408, 4 A.L.R.2d 1480].) ■ But in the instant case we do not believe it can be said that the amount due was a liquidated amount. The court impliedly found that the sale was not made in good faith. To determine the amount due a formula was devised by which the pool wine was assumed to be sold as a percentage of the wine sold. The amount due was only determined after the price received for these theoretical sales of pool wine was finally added together and certain deductions made. We do not believe that this was an amount certain, or an amount capable of being made certain, within the meaning of section 3287 of the Civil Code. The general rule that where an accounting is required in order to arrive at a sum justly due

interest is not allowed prior to the date of judgment should be applied in the instant case. (See *Stockton Theatres, Inc. v. Palermo*, 121 Cal.App.2d 616, 632 [264 P.2d 74].)

The judgment is modified so that the judgment in favor of each plaintiff will bear interest from the date of judgment instead of from July 31, 1954, and as so modified the judgment is affirmed; respondents to recover their costs on appeal.

Van Dyke, P. J., and Peek, J., concurred.

A petition for a rehearing was denied February 1, 1960, and appellant's petition for a hearing by the Supreme Court was denied March 1, 1960.