[Civ. No. 6090. Fourth Dist. Mar. 29, 1961.]

ERNEST A. MUNIER, Plaintiff and Appellant, v. C. E. HAWKINS, as Trustee, etc., Defendant and Appellant.

Crossland, Crossland & Richardson and Baxter K. Richardson for Plaintiff and Appellant.

Miles, Sears & Franson for Defendant and Appellant.

GRIFFIN, P. J.—Plaintiff, cross-defendant, respondent and appellant Ernest A. Munier (hereinafter referred to as plaintiff) brought this action for declaratory relief, seeking an interpretation of a certain agricultural lease agreement for the years 1955, 1956 and 1957, involving approximately 190 acres of fig orchard, and dry-yard facilities located on an adjoining 20 acres, in Fresno County. This lease was appended to the complaint which prayed for an accounting for rent and money due thereunder against C. E. Hawkins, defendant, cross-complainant, appellant and respondent (hereinafter referred to as defendant), as trustee under a trust created by his father in the last will and testament of

C. A. Hawkins, deceased, and against certain other named defendants. During the trial, by stipulation, the action was dismissed as against these remaining defendants. Defendant Hawkins, by cross-complaint, sought revision of the lease, interpretation of it, and an accounting.

Originally the Hawkins ranch consisted of about 400 acres planted mostly to figs but bordered by olive and walnut trees. A dry yard, including dehydration facilities, quarters for help and other equipment, occupied a portion of a 20-acre plot. For many years the orchard was owned and operated by C. A. Hawkins and Odelia L. C. Hawkins, his wife, as partners, and their books were kept for a long period of time by Matilda B. Anway. C. A. Hawkins died prior to 1955 and the Hawkins ranch was administered in his estate. Mrs. Anway and Mrs. Odelia L. C. Hawkins were executrices. His will created a trust which is represented by defendant herein as trustee. The probate court partitioned the ranch between Mrs. Odelia L. C. Hawkins and the testamentary trust, 190 acres to Mrs. Hawkins, 190 acres to the trustee, and 20 acres (including dry yard) to be jointly owned by them. Mrs. Hawkins died February 21, 1955, before distribution of the property previously partitioned to her and this property was later distributed to her estate. Defendants Mrs. Anway and Frances Comba Sweezey were executrices thereof and Mrs. Anway acted as sole trustee of the trust from March 21, 1955, until June 23, 1955. She and defendant acted as cotrustees from June 23, 1955, to May 15, 1957. Defendant C. E. Hawkins was the sole trustee of the trust property after May 15, 1957.

In 1954, Mrs. Hawkins leased 40 acres of her separately owned fig property to plaintiff Munier under a lease somewhat similar to the one here involved, excepting it provided that all processing of figs would be done through plaintiff's dry yard. Later she became quite ill with a heart condition and a problem arose as to the care and harvest of the entire ranch property for the year 1955. Defendant, step-son of Mrs. Hawkins, had been in the Navy from 1912 until 1950 and was not familiar with the operation of fig property. He returned home before his father's death and assisted to some extent in the operation of other ranch properties owned by the family. Defendant called plaintiff about leasing the 400 acres and harvesting the crop for the years 1955, 1956 and 1957. Apparently plaintiff drew, or had drawn, the lease here involved, which was patterned to a great extent after the

1954 lease between plaintiff and Mrs. Hawkins. In the preliminary negotiations, there was considerable confusion and objections were voiced about the terms of the lease, which objections were mainly raised by defendant. Mrs. Hawkins' attorney was consulted about it.

The properties were divided for leasing purposes. One lease was signed by Mrs. Hawkins in her ailing condition, and then by plaintiff Munier. It covered her 200 acres. Another similar lease was signed between Mrs. Hawkins and Mrs. Anway as trustees under the will and plaintiff Munier for the remaining 200 acres. The material portions of this lease are set forth in full in the footnote.*

About March 1, 1955, plaintiff took over the properties and

---

*"As rental for the said premises lessee promises and agrees to pay to lessor 70% of the net income, determined as hereinafter provided, from all crops produced upon said premises during the term of said lease. . . . As additional rental the lessee hereby agrees to pay the lessor for the use of the harvest and dry yard equipment and all ranch buildings, facilities and equipment, except mobile equipment, the sum of 5c per field picking box per season. The lessee is given the right and privilege to harvest other figs grown by him in Rosedale District and process them through the same dry yard facilities, and the said lessee hereby agrees to pay the lessor for the use of the same the sum of 5c per field picking box per season. . . . In arriving at the net income there shall be deducted from the gross income, the cost of labor computed in accordance with the schedule of charges as set forth in the separate schedule hereunto annexed and marked Exhibit 'A' [as follows]:

Ridging . . . . . . . . . . . . . . . . . . . . . . .$2.00 per acre—less 25%
Knock ridges . . . . . . . . . . . . . . . . . . . . 2.00 per acre—less 25%
Discing . . . . . . . . . . . . . . . . . . . . . . . 2.50 per acre—less 25%
Cultipacking . . . . . . . . . . . . . . . . . . . . 1.50 per acre—less 25%
Irrigation—labor charged at $1.25 per hour.
Spading and suckering charged at $1.25 per hour.
Hauling out wood and similar extra operations charged at $1.25 per hour for labor plus cost of tractor at $3.50 per hour.
All miscellaneous labor necessary during production to be charged at $1.25 per hour (example—pruning).
*Caprification and harvest costs are to be the regular commercial rates charged by lessee, less 10%.*
Pumping expenses to be charged against cost of production (power only).
All fertilizer and spray applications and materials to be mutually agreed as necessary before being applied and the same to be charged against the cost of production. [Emphasis ours.]

"It is further understood and agreed that the said lessee shall on or before the 1st day of December of each year make a final settlement with the lessor and pay unto the said lessor their share of the net income from the sale of said crops, and the said lessee further agrees to keep accurate records of the sale and disposition of said crops grown on the said premises, and of the costs of operation, and the said lessor shall have the right at all reasonable times to inspect said records. . . . In event of suit, lessor shall be entitled to a reasonable attorney fee in event he recovers judgment in any court."

jointly cultivated and tended the orchards under the leases. He was in need of financing and in order to obtain it the finance company required that defendant also sign the lease in reference to the trust property. After considerable argument between plaintiff and defendant in reference to its terms and the advisability of entering into it, and after consultation with Mrs. Hawkins' attorney, defendant consented and also signed it. Plaintiff owned his own acreage of figs and also operated his own dry yard in connection therewith and harvested other persons' crops using his dry yard and dehydration plant in connection therewith and had a fixed charge for harvesting called his "regular commercial rate." After the harvesting of the 1955 crop from the 400 acres, and after the close of the 1955 season, plaintiff rendered an accounting to defendant as trustee, and to Mrs. Anway as executrix of the estate of Mrs. C. E. Hawkins, deceased. This skeleton account charged as harvest expenses certain sums for preharvest labor, tractor work and equipment, walnut harvest, miscellaneous preharvest and miscellaneous harvest expenses, totaling $44,530.94 and deducted this amount from the gross income of $101,947.52, leaving a balance of $57,416.58 to be distributed on a basis of 70 per cent for the lessor and 30 per cent for the lessee. It will be noted that in this statement lessee lumped together the gross income from the sale of the figs produced on the adjacent premises owned by Odelia L. C. Hawkins and processed by lessee through lessor's dry yard. Lessee's statement did not break down income and expenses on the leased property separately from the income and expenses on the adjacent premises.

Complaint was made by defendant as to the indefiniteness and uncertainty of the account and a new account was prepared on January 10, 1956, with greater itemization, on the same basis, listing in detail the "harvest expense" including cost of labor and caprification. There was also a charge against gross income of five cents per field picking box as rental for use of lessor's dry yard. It showed a combined gross income of $101,947.52; expense, $41,840.22; and net income of $60,107.30.

Apparently defendant was not satisfied with some of the items charged and wanted further verification. Plaintiff then consulted his attorney, a certified public accountant was engaged, and plaintiff then, on May 29, 1956, prepared and forwarded to defendant and Mrs. Anway a new and entirely

different account for 1955, different not only in amount but predicated on a different basis, plaintiff claiming he did not examine the terms of his lease before he rendered the previous reports for the year 1955. The main difference was in his method of accounting for "harvest expenses." Instead of charging on the basis of his actual harvest cost, as was itemized on the first two accounts, he charged as harvest expense the "commercial rate" (less 10 per cent) he used in charging other growers for figs processed through plaintiff's dry yard, resulting in an increase of cost from $27,132.57 to $54,199.48. Plaintiff testified his "commercial rate" for such harvest expense included a per-box allocation for labor costs at his own dry yard, depreciation on buildings and dehydrating equipment, trucks, gas and oil, insurance on figs processed, plus 10 per cent profit margin.

In the 1956 and 1957 crop years, plaintiff accounted to lessor on the same basis and indicated that the 1956 crop showed a net loss of $3,586.72, and the 1957 crop, a net profit of $5,604.75.

At the instance of defendant, the credit company held up disbursement of the proceeds of the three years until a final accounting could be reached by the parties as to the 1955 operations. This action was filed about October 15, 1957. By written agreement of the parties to this action, dated November 27, 1957, all money received for the years 1955, 1956 and 1957, and not theretofore disbursed, was deposited with a trustee, to be placed in a savings account, at interest, pending the conclusion of this action.

After several days of trial and consideration of the voluminous record and many exhibits, the trial court found generally in accord with the report of the plaintiff's certified public accountant and found against defendant's contentions on his cross-complaint. It further found that plaintiff had, in the years 1955, 1956 and 1957, a regular commercial rate applicable to fig harvest costs under the lease, which was, in 1955, $1.16 per box; in 1956, $1.155 per box; and in 1957, $1.32 per box; and that it was the intention of the parties that the fig harvest cost for these years should be computed on this basis, less 10 per cent. The court then allowed certain deductions in each year for certain overcharges and found that plaintiff failed to account to defendant for these items plus crop receipts in 1955 for $5,340.47, and held this error occurred because plaintiff apportioned this sum to the estate property instead of the trust property.

It then found that plaintiff paid $2,042.65 to defendant for the crop year 1955 as dry-yard rental at the rate of five cents per box and $1,778.95 for 1956; that plaintiff paid nothing to defendant on account of this rental for 1957 and found plaintiff owed defendant an additional $1,854.05 for that year's rental. The court denied defendant's claim for attorney's fees under the provisions of the lease; found to be untrue defendant's claim that plaintiff failed to farm the property in a good and farmerlike manner or committed waste thereon or lost production because of the methods employed in the care of and in farming the premises. It then awarded to plaintiff the principal sum of $14,750.57 from the savings account, plus certain specified interest, and awarded to defendant the remainder thereof. Judgment was entered accordingly. Both plaintiff and defendant appeal from the judgment.

### LEASE INTERPRETATION

■■■ It well appears from reading the lease in respect to the manner in which the cost of labor was to be computed, regarding ''caprification and harvest costs,'' that two reasonable interpretations exist. The main lease provides that in ''arriving at the net income there shall be deducted from the gross income, the cost of labor computed in accordance with the schedule of charges set forth in Exhibit A.'' As will be noted, Exhibit A specifies certain fixed labor charges for ridging, etc. It then recites that ''Caprification and harvest costs are to be the regular commercial rates charged by lessee, less 10%.'' It is defendant's contention that this latter provision applies only to the *labor charges* which were to be according to plaintiff's regular commercial rates for labor, less 10 per cent. Plaintiff claims he had no regular commercial rate for labor alone, but had a regular commercial rate he charged for caprification and harvest costs which included depreciation, insurance, etc., on his plant and that this rate was applied in all accounting after the first two accounts which were erroneously figured. He testified that harvesting operations consisted of spreading boxes in the field, placing machinery in good condition for operation, moving pickers, picking, trucking the fruit, dehydrating, sorting and delivering to the packing house. This provision of the lease is not clear and was a proper subject for interpretation by the trial court upon the production of extrinsic evidence.

To us it appears that both plaintiff and defendant, in the first instance, did believe that this provision applied to labor

charges only and the actual cost of such labor, based on plaintiff's commercial rate less 10 per cent, plus harvest cost generally, and that this was a proper interpretation of the lease.

It is the rule that when a contract is uncertain as to its meaning, it is proper for the court to look at the subsequent conduct of the parties to ascertain how they themselves construed the contract. This is strong evidence of the parties' original intentions. (*Woodbine* v. *Van Horn,* 29 Cal.2d 95 [173 P.2d 17].)

It does appear that in fixing the other labor charges mentioned in Exhibit A, the parties agreed that the rate to be charged was at $1.25 per hour but most of the laborers employed actually received only 90 cents per hour, and that the full amount of $1.25 per hour should be charged against gross receipts. This might well allow for the 10 per cent discount on this item. Since plaintiff also figured the cost with respect to the first two accountings on this basis, it would appear to us that the trial court would have been fully justified in so interpreting the lease.

Plaintiff now claims, and so testified, that he had but the one commercial rate, which included depreciation, gasoline, trucks, oil, interest on money, insurance on the figs, and all factors involved at cost, and that he added 10 per cent thereto as profit; that this was his regular commercial rate; and that in consideration of charging this regular commercial rate, there was a discount of 10 per cent, and that he also allowed five cents per box to defendant for all boxes processed through defendant's dry yard as an offset of any depreciation and insurance charges, etc.; and that he paid this sum direct to the lessors of the two leases for this purpose. Plaintiff produced two checks made payable to lessors for this purpose and the court allowed a similar offset in the final accounting for the year 1957 to defendant for this same allowance. Some claim is made that the five-cent-per-box allowance was too low and that it should have been more. Plaintiff testified that this subject was discussed with the parties and he gave them a choice of accepting that figure or he would withdraw from the contract and he claims that they all accepted.

The lease itself contains conflicting provisions in reference to these particular payments. In one paragraph it provides that lessee shall pay to *lessor* five cents per box for the use of the dry yard, both for lessor's figs and figs grown on other land and processed through lessor's dry yard by plaintiff. In another paragraph it provides that in arriving at the net

income there shall be included in the cost of production costs of rental of lessor's dry yard and other harvesting costs and such amount shall be *charged against gross income*. In the first accounting for 1955, plaintiff charged such rental against the gross income. In the later accounting, he testified he paid the lessor direct for such rental and the cancelled checks so indicate.

However, since the trial court took evidence on the subject as to the intention of the parties, which was highly conflicting, this court is not authorized to place a different construction thereon where either construction is a reasonable one.

■ In *Estate of Rule*, 25 Cal.2d 1 [152 P.2d 1003, 155 A.L.R. 1319], it was held that an appellate court will accept or adhere to the interpretation of a contract adopted by the trial court and not substitute another of its own, where parol evidence is introduced in aid of interpretation of the contract, and where said evidence is such that conflicting inferences may be drawn therefrom. See also *Union Oil Co.* v. *Union Sugar Co.*, 31 Cal.2d 300, 314 [188 P.2d 470].

### ATTORNEY'S FEES

■ Defendant next claims the court erred in denying him attorney's fees under the provision of the lease as prayed for in his cross-complaint. The paragraph relating to attorney's fees provides in general that should the lessee make default in payment of rent or in the performance of any of the covenants thereof, and in the event of suit, lessor shall be entitled to a reasonable attorney's fee in event he recovers judgment.

The original action was instituted by plaintiff to construe the lease and recover what he claimed was due under it. Defendant answered, denied the amount claimed was due, and by way of cross-complaint sought a different construction of the lease, alleged a violation of it, sought an accounting and prayed for such relief. In effect, the court construed the lease in favor of plaintiff's contention and allowed judgment based upon that contention, but did decide in favor of defendant as to certain protested items for which plaintiff did not give credit to defendant. One item amounted to $5,340.47, which the trial court found to be an error, and another item of $1,854.05 for failure to give defendant credit for $1,854.05 for the use of defendant's dry plant for the year 1957. Had it not been for defendant's forced action in defending the action and seeking redress for this claimed credit, he would

have been obliged to pay a greater amount. Plaintiff as well as defendant appeal from the judgment which, in effect, allowed defendant greater credits than plaintiff claimed. We will assume therefore that defendant did, in effect, recover, at least in part, a judgment in his favor. (*Moss Construction Co.* v. *Wulffsohn,* 116 Cal.App.2d 203 [253 P.2d 483].) We see no reason why the court should deny him his reasonable attorney's fees in this respect. See *Ansco Const. Co.* v. *Ocean View Estates,* 169 Cal.App.2d 235, 240 [337 P.2d 146]; *Techow* v. *Pollack,* 111 Cal.App.2d 556 [244 P.2d 915]; *Mann* v. *Mann,* 76 Cal.App.2d 32 [172 P.2d 369]; *Dozier* v. *Hillman,* 105 Cal.App. 127 [287 P. 116]; *Conner* v. *Blodget,* 18 Cal. App. 787 [124 P. 733]; Code of Civil Procedure, section 1021; 3 Witkin, California Procedure 1912, section 31.

## INTEREST

 The court, in addition to plaintiff's share of the accumulated interest on the moneys impounded in the savings account, also allowed plaintiff the legal rate of interest (West's Anno. Civ. Code, § 1916.1 [section 1, Stats. 1919, p. lxxxiii, Deering's Gen. Laws, Act 3757]) on $14,750.57, according to a schedule beginning December 1, 1955, and ending April 15, 1958; and allowed defendant interest of $141.35 after December 1, 1956, on credits due defendant from plaintiff. Apparently the legal rate of interest was added as a part of the damages claimed to have been suffered by the party to whom payment was due under Civil Code, section 3302. (*Perkins* v. *Benquet Consol. Min. Co.,* 55 Cal.App.2d 720, 769 [132 P.2d 70], and cases cited.)

Ordinarily, the legal rate of interest runs from the date of rendition of the judgment. (Code Civ. Proc., § 1033.) Civil Code, section 1915, provides for the recovery of interest "for the use, or forbearance, or detention of money." In the instant case, defendant did not have the use of, or detain, the money during this period. It was held in trust by agreement of the parties. In *Comastri* v. *Burke,* 137 Cal.App.2d 430 [290 P.2d 663], it was held that interest may not be recovered by plaintiff over the period that the proceeds of the sale of a home were held in escrow or in deposit in court pending the litigation of defendant's claim that the home was bought with money taken from a joint account in which defendant had an equal interest, since defendant does not owe interest on the basis of Civil Code, section 1915. See also *Buckman* v. *Tucker,* 9 Cal.2d 403 [71 P.2d 69]. In

*Schmidt* v. *Waterford Winery, Ltd.,* 177 Cal.App.2d 28, 34 [1 Cal.Rptr. 874], there was a complete accounting demanded, which was required to determine the amount due, if any, from defendant. Analyzing Civil Code, section 3287, the court held that:

". . . when there is no contract to pay interest . . . the law awards interest upon money from the time it becomes due and payable, if such time is certain and the sum is certain or can be made certain by calculation" but said that in an action by grape growers against a winery for an accounting to determine the amount due for grapes sold to the winery under an agreement whereby the wine made therefrom was to be pooled with other wine and sold at the best prices obtainable at the time of sale, the growers were not entitled to interest on the amount found to be due them prior to judgment, because the amount due was uncertain and incapable of being made certain within the meaning of Civil Code, section 3287. *Lineman* v. *Schmid,* 32 Cal.2d 204, 209 [195 P.2d 408, 4 A.L.R.2d 1480], discusses the rule here applicable. It involved a claimed breach of contract to purchase flour and it held the rule in this state to be that if damages were not susceptible of ascertainment, either by computation of the contract or from established market rates, interest was not allowable until the amount due had been determined by judicial process. See also *Hewes* v. *Germain Fruit Co.,* 106 Cal. 441 [39 P. 853]; *Easterbrook* v. *Farquharson,* 110 Cal. 311 [42 P. 811]. ▮ In *Stockton Theatres, Inc.* v. *Palermo,* 121 Cal.App.2d 616, 632 [264 P.2d 74], the court said:

"Generally speaking, where an accounting is required in order to arrive at a sum justly due, interest is not allowed." (Citing cases.) See also *Leonard* v. *Huston,* 122 Cal.App.2d 541, 546 [265 P.2d 566].

▮ It would be equitably unfair to allow plaintiff interest on the savings account for the amount of the judgment during this period and also allow plaintiff additional legal interest on the same amount for that period. Furthermore, under the lease, the crops and the proceeds from the sale thereof were to be jointly owned by lessor and lessee at all times and this ownership continued until their respective interests were determined. In addition, the stipulation of the parties in respect to these funds states that the funds in question were, by agreement, turned over to the trustee and said money was to be deposited in a savings account "so that

monies will earn interest pending settlement of this action'' and that neither party will demand said moneys during that period, and upon entry of a final judgment, the ''trustee shall disburse said monies, together with interest earned thereon, to the parties in accord with their respective interests therein.'' This stipulation was filed in lieu of a request for appointment of receiver by defendant. This stipulation itself rather indicates that no damages for withholding would result and that no additional interest would be awarded. It further indicates that there was no contention that the lease agreement was definite as to the sums due or that the exact sums of money owing to plaintiff could be reasonably ascertained by calculation. The judgment allowing legal rate of interest before entry of judgment must be reversed.

### Remaining Questions Raised

The evidence as to plaintiff's failing to farm the property in a good and farmerlike manner, that he committed waste thereon and lost production, and that there was a mutual mistake in the terms of the lease, is conflicting and falls within the general rule as to the duty of the trial judge to resolve such conflicts. (*Chichester* v. *Seymour*, 28 Cal.App.2d 696 [83 P.2d 301].)

The judgment of the trial court finding that plaintiff was entitled to $14,750.57, plus his proportionate share of accumulated interest in the savings account, is affirmed. The portion of the judgment allowing legal rate of interest thereon prior to entry of judgment is reversed. The portion of the judgment disallowing defendant reasonable attorney's fees is reversed and the trial court is directed to determine such fees as may be reasonable. Each party to pay own costs on appeal.

Shepard, J., and Coughlin, J., concurred.

Petitions for a rehearing were denied April 18, 1961, and the petitions of plaintiff and appellant and of defendant and appellant for a hearing by the Supreme Court were denied May 24, 1961.