[Civ. No. 24500. Second Dist., Div. One. Dec. 29, 1960.]

U. S. PROPELLERS, INC. (a Corporation), Appellant, v. ZENITH PLASTICS COMPANY (a Corporation), Respondent.

Walter F. Pettit for Appellant.

McCutchen, Black, Harnagel & Shea, G. William Shea and John Lawrence Leary for Respondent.

FOURT, J.—This appeal is from a judgment in an action for breach of contract.

A résumé of the facts is as follows:

Western Electric Company contracted with an agency of the United States Government to produce a radar set for the nation's air defense system. Western Electric, in turn, let a two and one-quarter million dollar subcontract to Zenith Plastics Company (hereinafter referred to as "Zenith") in the first half of 1957 to produce a component of that radar set. One of the essential features of this subcontract was the absolute necessity of meeting the delivery date of an acceptable first article by Zenith. Pursuant to this contract, Zenith determined which parts of this component could be manufactured by Zenith itself, and which parts by subcontractors of Zenith. One of the parts within the latter category was the metal honeycomb fabrication for a parabolic reflector antenna assembly.

In the latter part of May 1957, Zenith distributed requests for quotations on this component to various possible subcontractors. One of these subcontractors, U. S. Propellers, Inc. (hereinafter referred to as "U.S.P."), submitted a quotation on June 10th to supply 140 such parabolic reflectors and one lot of tooling. U.S.P. was the only bidder.

Subsequently, on June 12th, a prearranged conference was held between personnel of U.S.P. and of Zenith at the latter's plant. At this conference a general discussion of the technical and other requirements of the proposed contract took place. The technical requirements were reviewed in detail and the absolute necessity of U.S.P.'s meeting a September 13th deadline for delivery of an acceptable first article was repeatedly stressed. U.S.P. represented that it could and would meet this schedule.

Zenith further required that U.S.P. furnish as rapidly

as possible a satisfactory tool plan, which, in general, consists of a detailed description of each tool to be used to fabricate the required article, the construction of each tool, its use, and the reference tool required. The plan of U.S.P. was to show the starting date, the flow (including the application of the reference tool to the basic tool and all subsequent tools which are tied back to this common reference), and the completion date for each tool, as well as the time schedule for the entire program. A tool plan includes, among other things, sketches clarifying the approach to be taken and illustrating the flow of the manufacturing operations, the application of reference tools, and basic construction details. The requisites of a tool plan were explained to U.S.P., and the Zenith tool plan for the Western Electric contract was shown to them as a model for U.S.P.'s tool plan.

The record discloses a number of reasons why a tool plan is essential once performance is begun, namely: to furnish Zenith with the information required to prepare specific tool work orders and purchase orders; to enable Zenith to establish its accountability to the government for all tools since all tooling which was produced belonged to the government; to enable Zenith to coordinate the performance of this particular subcontractor with that of the other subcontractors working on the same project; to inform Zenith when it would have to supply gages and other check tools to U.S.P., and to coordinate this with the requirements of other subcontractors; and to give Zenith an accurate indication of U.S.P.'s ability to perform (i.e., whether the engineering capability to produce was present). Such tool plans are generally submitted as a matter of course very shortly after a ''go-ahead'' is given on a subcontract. Although U.S.P. promised to furnish such a plan, none was ever received by Zenith.

At the June 12th conference, Zenith also requested that U.S.P. furnish a financial statement to the end that Zenith could ascertain whether U.S.P. had the financial ability to expend large sums of money (i.e., at least $100,000) for production of this component prior to the receipt of any moneys from Zenith. This was never received by Zenith, although another request was made therefor after June 12th. At the conclusion of the conference, Zenith gave U.S.P. an oral go-ahead on the contract. This is a standard method of initiating such contracts in the particular industry. The record discloses that the go-ahead was given with the under-

standing that Zenith's written purchase order would be issued when, and only when, a satisfactory tool plan was furnished by U.S.P.[1]

Zenith did give U.S.P. the "purchase order *numbers*" which were to be assigned to the written purchase orders when they were issued.

Because of the necessity of meeting a firm delivery date of the subcontract, Zenith commenced close liaison with U.S.P. to insure on-schedule production. One of Zenith's buyers and a tool engineer visited U.S.P.'s plant approximately one week later and it was their opinion that U.S.P. was not making satisfactory progress on the job. U.S.P. admitted that it was so told.

U.S.P.'s facilities were inadequate and the personnel did not demonstrate the necessary skill to fulfill the contract. The subcontractors of U.S.P. also indicated lack of any progress.

On June 28th, the same Zenith employees again visited U.S.P.'s plant. As a result of this visit, it was their opinion that U.S.P. was not and would not be able to undertake the production of the items successfully. Among other things, U.S.P. appeared unable or unwilling to progress beyond the rough drawing and planning stage, or to submit the necessary tool plan or financial statement. Although U.S.P. admittedly was not equipped to perform all of the work itself, its management had not decided what phases of the work would be done by U.S.P. and what phases would be subcontracted, and had prepared no flow chart or other indication of how they intended to fabricate the items. U.S.P. had failed to let any subcontract although it admitted that the majority of the tools to make the component U.S.P. was to deliver to Zenith would have to be produced elsewhere.

To protect itself in the face of the situation with which it was confronted Zenith called for quotations from other concerns. On July 8, 1957, in response to Zenith's second series of requests for quotations, North American Aviation Company submitted an acceptable quotation accompanied by a satisfactory tool plan.

On July 9, 1957, Zenith cancelled its contract with U.S.P. The following day, U.S.P. received five written purchase orders together with five change notices, the latter of which read:

---

[1]The tool plan would have to be approved by the tool engineer of Zenith and his approval would have been the authorization for the purchasing agent to write a purchase order.

''Cancel entire order—Convenience of Zenith Plastics. Advise cancellation charges. Confirming wire July 9, 1957.''

U.S.P. filed its second amended complaint for breach of contract on January 17, 1958. The pretrial conference order filed February 20, 1959, states in pertinent part as follows:

''[T]he parties stipulate that the issues are as set forth under items 1, 2, 5 and 6 including the subdivisions of 2.[2] With respect to the third issue,[3] plaintiff will concede that there was such a custom but contends that there are exceptions thereto. With respect to the fourth issue,[4] plaintiff will stipulate that there is no issue of the right to terminate under the purchase order issued on or about July 9, 1957 if such purchase orders were applicable to the procurement in issue.''

After a trial on the merits, ''Findings of Fact and Conclusions of Law'' were filed July 31, 1959. These findings provide in pertinent part as follows:

''IV

''On or about June 12, 1957, representatives of plaintiff and defendant conferred at defendant's plant. . . . Plaintiff

---

[2] ''(1) Did Zenith and U.S. Propellers enter into contractual relations with each other on or about June 12, 1957?

''(2) If such contractual relations were then entered into, what were the terms and conditions thereof, and did such terms and conditions include any of the following as part of such terms and conditions:

''(a) that implicitly U.S. Propellers was to establish to Zenith's satisfaction that U.S. Propellers had the facilities and ability to meet the tight delivery requirements established by Western Electric as the prime government contractor;

''(b) that U.S. Propellers was to furnish Zenith immediately a tool plan which would meet Zenith's requirements; if this condition was made a part of such contract was it waived by Zenith?

''(c) that U.S. Propellers was to furnish Zenith proof of U.S. Propellers' financial ability to perform; if so, when was this to be done;

''(d) that any agreement between the parties would be incorporated in a written purchase order to be issued by Zenith to U.S. Propellers.

''. . . . . . . . . . . .

''(5) What is the amount if any, to be paid by Zenith to U.S. Propellers as the result of the termination?

''(6) Assuming Zenith had the right to terminate, did U.S. Propellers reject, waive or abandon its right to receive termination charges from Zenith by failing to act on Zenith's request to submit such termination charges when requested to do so by Zenith?''

[3] ''(3) Was it customary and usual for this type of a subcontract to be made the subject of a written purchase order to be issued by Zenith, the buyer, to U.S. Propellers, the seller?''

[4] ''(4) Pursuant to the form of purchase order used by Zenith and issued by Zenith to U.S. Propellers, did Zenith have the right to terminate further work by U.S. Propellers subject to the payment by Zenith to U.S. Propellers of termination charges in accordance with the terms of such written purchase order?''

then and there stated to defendant that it could meet said delivery schedule.

"V

"Plaintiff agreed at such . . . conference to produce a tool plan for defendant and to deliver it to defendant within a reasonable time, and also to furnish to defendant within a reasonable time certain financial data demonstrating plaintiff's financial ability to perform in this proposed procurement.

"VI

"During this . . . conference, and in accordance with plaintiff's commitments . . . plaintiff was given by defendant an oral go-ahead to produce only 140 of said parabolic reflectors and one lot of tooling, for the total sum of $258,488. These reflectors were to be delivered to defendant in accordance with the following schedule: A first acceptable unit due September 13, 1957; a second acceptable unit due November 1, 1957; and balance, 30 acceptable units per month starting December 1, 1957.

"VII

"During this . . . conference, defendant supplied plaintiff with defendant's purchase order Nos. 26526-1C, 26527-T1, 26528-T1, 26529-T1 and 26530-T1 to cover the purchase by defendant from plaintiff of the said 140 parabolic reflectors and tooling. *It was agreed by the parties that the terms and conditions of defendant's standard written purchase order form would be a part of the contract made by them and that such written forms would be issued by the defendant to the plaintiff.* [Emphasis added.]

"VIII

"It was customary and usual in the industry in which plaintiff and defendant were engaged that contracts . . . be made the subject of written purchase orders to be issued by the buyer (defendant) to the seller (plaintiff).

"IX

"*One of the terms and conditions agreed to by the parties as part of their contract was paragraph 11 of defendant's standard purchase order form, which provided as follows:*

"(a) *The Buyer may terminate work under this order in whole or in part at any time by written or telegraphic notice. Such notice shall state the extent and effective date of such termination; and, upon the receipt thereof, the Seller will, as and to the extent directed by the Buyer, stop work under this order and the placement of further orders or subcontracts*

*hereunder, terminate work under orders and subcontractors outstanding hereunder, and take any necessary action to protect property in the Seller's possession in which the Buyer has or may acquire an interest.* [Emphasis added.]

"...                   .   .   .   .   .   .   .   .   .   .

"X

"*There was a general custom and usage prevailing in the industry* in which the parties were engaged to include, *as a standard term and condition of the parties' purchase order, a termination clause* (most frequently used—Armed Services Procurement Regulation 8-706, by incorporation) *granting to the buyer an unrestricted right to cancel the purchase order for its sole convenience. The termination clause used by defendant,* and cited in Finding of Fact IX above, *conformed to this general custom and usage.* [Emphasis added.]

"XI

"Subsequent to June 12, 1957, and prior to July 9, 1957, defendant's personnel . . . found that *unsatisfactory progress* was being made by plaintiff under said contract. [Emphasis added.]

"XII

"*No tool plan or financial data were ever submitted* . . . and a reasonable time for the production and delivery of said tool plan and financial data had elapsed on or before July 9, 1957. [Emphasis added.]

"XIII

"On or about July 9, 1957 *defendant terminated its contract with plaintiff pursuant to said paragraph 11 of the terms and conditions of defendant's standard purchase form.* Defendant at this time requested plaintiff to advise defendant of plaintiff's cancellation charges in order that reimbursement might be made to plaintiff for the work done, . . ." [Emphasis added.]

The "Conclusions of Law" provide in pertinent part as follows:

"II

"*The terms and conditions of said contract included that certain termination clause set forth in Finding IX* of the foregoing Findings of Fact, *and also* that plaintiff was to produce and deliver to defendant within a reasonable time a tool plan and certain financial data. *That plaintiff breached said contract by failing to produce and deliver to defendant,*

*within a reasonable time, a tool plan and certain or any financial data.* [Emphasis added.]

"III

"*The contract* made by the parties *incorporated the prevailing custom and usage of the industry in which the parties were engaged with respect to issuance of written purchase orders . . . and incorporated the prevailing custom and usage under which the defendant, as Buyer, had the right to terminate said contract at its option,* . . . [Emphasis added.]

". . . . . . . . . . . .

"VI

"*Defendant lawfully terminated its contract with plaintiff in accordance with the termination clause of said contract.* [Emphasis added.]

". . . . . . . . . . . .

"VIII

"That because plaintiff was in default under said contract and breached the same, . . . defendant is entitled to judgment . . ."

The "Findings and Conclusions" contain several bases for holding for the defendant; namely that the parties agreed that one of the terms and conditions of their contract was paragraph 11 of defendant's standard purchase order form (Findings VII and IX—*i.e.* unrestricted right of termination) ; that because of the general custom and usage prevailing in the industry the buyer had an unrestricted right to terminate and paragraph 11 of defendant's standard purchase order conformed to this general custom and usage (Finding X) ; and that plaintiff had breached the contract because of unsatisfactory progress and failure to submit a satisfactory tool plan and financial statement (Findings XI and XII).

If any one of the above bases find support in law and fact, then the judgment must, of course, be sustained. (*Walling* v. *Kimball,* 17 Cal.2d 364, 373 [110 P.2d 58].)

Appellant's first contention is that the trial court erred when it found that the contract between the parties contained the termination clause as set forth in Finding IX. Appellant asserts that the oral go-ahead of June 12th was a "preliminary agreement" and that a "definitive agreement" was to follow ; that this "preliminary agreement" did not contain the termination clause. It is stated in the appellant's opening brief :

"Zenith's notice to proceed was understood by the parties

to be a preliminary agreement. They contemplated entering into a formal, written agreement subsequently, when U. S. Propellers submitted a tool plan . . . *U. S. Propellers anticipated that this subsequent agreement would be on Zenith's standard purchase order form*, but it had no knowledge as to what additional terms and conditions would be included on that form.'' [Emphasis added.]

Appellant's contention of a ''preliminary agreement'' does not find support in the record. On the contrary, the record below fully supports the trial court's finding that Zenith and U.S.P. entered into a binding, complete and express agreement on June 12, 1957 (Findings VI, VII and IX).

It is established that the parties on June 12th intended that Zenith's standard written purchase orders should issue to U.S.P. at such time as they had supplied Zenith with an acceptable tool plan. Appellant stated in its brief with reference to this matter that:

''It is true that the parties fully intended to enter into a definitive agreement, when U. S. Propellers submitted its tool plan, and that U. S. Propellers understood that such agreement would be on Zenith's standard purchase order form, which would include Zenith's standard terms and conditions . . . U. S. Propellers does not argue nor contend otherwise. . . .''

Apparently, appellant takes the position that the issuance of the written purchase order would constitute some new contract (as distinguished from the oral go-ahead). The following excerpt from the reporter's transcript shows a true function of the written purchase order:

''Q. What reference was made, if any, at this meeting of June 12 to Zenith's purchase order form? A. That a written purchase order could not be written up until such time as the tool plan was furnished.

''Q. Why was that? A. Because it would have to be approved by the tool engineer . . . and that would be the authorization for purchasing to write up the purchase order on the tooling required.

''Q. Was this internal control? A. It is internal control.

''Q. Do you know why it was maintained? A. Well, it gave the tool engineer, would tell him the tools that were to be made, the money expended and the usage of the tools.

''Q. Do you know in this particular Western Electric-Zenith contract and any subcontracts under it whether there was any accountability to any government agency for such tools? A. Yes, there was to the Army Ordnance.

"Q. Did this engineering control over the procurement of tools have any connection with that accountability? A. Yes. As the authorization was given from the tool engineer then definite charge numbers would be assigned to each individual tool along with part numbers for each tool and would in turn be charged to the prime or the government."

It appears obvious that the written purchase order was not intended to confer greater rights, impose new or additional burdens, or as appellant states, to serve as a "definitive agreement" as distinguished from the purported "preliminary agreement."

U.S.P. admits that it was told that it would receive, and fully expected to receive, the Zenith standard purchase orders, including the termination clause. The reporter's transcript discloses that Mr. Schwarzenbach, who was the president or general manager of U.S.P. at the time in question testified:

"A. Yes, whatever clauses are required by law I would certainly expect to be in there.

"Q. Would you also have expected to have included the termination clause? A. Yes."

The record is devoid of any evidence that U.S.P. objected to any of the standard clauses contained in Zenith's purchase order or to the form of the purchase order. Furthermore, U.S.P. failed to ask Zenith for its purchase order form.

Appellant further states in its opening brief:

"U. S. Propellers (for the purpose of this appeal) accepts the fact that there is sufficient evidence in the record to support the trial court's findings that it was customary in the field of Government subcontracts, at the time the parties entered into their preliminary agreement, to incorporate in a buyer's written purchase order a clause granting to the buyer an unrestricted right to terminate, either expressly or by incorporation of ASPR 8-706, and that Zenith's standard termination clause (paragraph 11 of its terms and conditions) conformed to that custom." Termination clauses and terminations in general are ordinarily accepted by vendors in the industry without question.

The record is devoid of any express statement of U.S.P. at any material time, that the contract made on June 12th was in any sense "preliminary." On the contrary, the parties stipulated that:

"On or about June 12th or 13th an oral go-ahead was given to plaintiff to produce 140 parabolic reflectors and certain tooling necessary for such production, in accordance with the

blueprints and specifications furnished to plaintiff with Zenith's 'Request for Quotation,' for the total sum of $258,488. This oral go-ahead required plaintiff to deliver the 140 parabolic reflectors in accordance with the following schedule: 1st unit due 9-13-57; 2nd unit due 11-1-57; and balance 30 per month starting 12-1-57. Further, under the scope of this go-ahead, plaintiff had the authority to procure all materials, to fabricate, to subcontract, and, in general, to produce.''

The trial court found upon substantial evidence that the agreement of the parties did contain the terms and conditions of the purchase order (Finding VII) and that one of the terms was the termination clause (Finding IX). In the pretrial conference plaintiff stipulated ''. . . that there is no issue of the right to terminate under the purchase orders issued on or about July 9, 1957 if such purchase orders were applicable to the procurement in issue.''

It is our conclusion that the contract between the parties contained the termination clause as found by the trial court.

Appellant's next contention is directed as to whether there is any qualification or restriction on Zenith's right to terminate. Appellant states the matter in this way:

''U. S. Propellers accepts the fact that it is customary to include in Government subcontracts (the situation presented here) a clause granting to the buyer an *unrestricted right to terminate,* . . . [Emphasis added.]

''There is no qualification or other restriction on this right. The right, *so far as the language is concerned,* is absolute. . . . [T]he ultimate question presented . . . is this: Can Zenith use this or a similar clause with its unrestricted right to terminate for *unrestricted purposes?*''

As indicated by the pretrial conference order plaintiff stipulated that if the purchase orders were applicable to the procurement, then ''there was no issue of the right to terminate.'' This stipulation itself is an answer to appellant's contention. (*Aero Bolt & Screw Co.* v. *Iaia,* 180 Cal.App.2d 728, 743 [5 Cal.Rptr. 53]; *Dell'Orto* v. *Dell'Orto,* 166 Cal.App.2d 825, 831 [334 P.2d 97]; *Chapin* v. *Gritton,* 178 Cal.App.2d 551, 563, 565 [3 Cal.Rptr. 250].) However, in any event, there is substantial evidence in the record to demonstrate without question that the custom in the industry did not limit the right of a party to terminate its subcontractor in the situation where there is a higher tier termination (i.e., where the government had previously cancelled). (See *Pacific Grape Products Co.* v. *Commissioner of Internal Revenue,* 219 F.2d 862 [9th

Cir. 1955]; *California Lettuce Growers, Inc.* v. *Union Sugar Co.*, 45 Cal.2d 474 [289 P.2d 785, 49 A.L.R.2d 496]; *Miller* v. *Germain Seed etc. Co.*, 193 Cal. 62 [222 P. 817, 32 A.L.R. 1215].)

Actually, the termination clause in the contract is by no means unrestricted. While the *right to terminate is unrestricted,* the exercise of that right imposes certain obligations and burdens on the buyer. In the event of termination, Zenith was required to pay termination charges; it included reimbursement for all of U.S.P.'s expenses, plus a negotiated percentage of them.

We think that the trial judge was correct when he stated:

"In my opinion the plaintiff cannot prevail. . . . [T]he purchase order form of Zenith Plastics was contemplated would be a part of the contract and I think it is a part of the contract. . . . I think McClure's testimony indicated the necessity for such a right in this type of contract. Looking at the type of government contract, one where you have critical integrated materials involved, in the first place, I think it was in the written contract. I think their purchase order form was contemplated and expected by all parties to be a part of the contract, partly oral and partly written. Furthermore, I think it was in accord with the custom and trade usage in that they had a right to terminate upon the condition of paying termination costs. . . ."

It was further stated:

"My ruling is simply this: That in the . . . June 12th meeting purchase order numbers were allotted. Everybody agreed that purchase orders on the form of Zenith, in use by Zenith were to follow. . . . It is my view that the purchase orders of Zenith in this case are the contemplated terms and conditions that were to be in writing. Other things were agreed upon orally. . . . [T]hat the provisions of this agreement with reference to termination are in accord with the prevailing custom and usage."

For the reasons stated the judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied January 23, 1961, and appellant's petition for a hearing by the Supreme Court was denied February 21, 1961.