[Civ. No. 20308.  First Dist., Div. One.  July 3, 1963.]

SANTA CLARA PROPERTIES CO. et al., Plaintiffs and Appellants, v. R. L. C., INC., Defendant and Respondent.

Arguello, Giometti, McCarthy for Plaintiffs and Appellants.

Jacobs, Sills & Coblentz, William K. Coblentz and Donald M. Cahen for Defendant and Respondent.

MOLINARI, J.—This is an appeal by plaintiffs from a judgment in favor of defendant and cross-complainant adjudging that plaintiffs take nothing by their complaint seeking rescission, or, in the alternative, damages.

*The Facts*

On August 13, 1959, appellant[1] and respondent entered into a written agreement wherein the former agreed to buy and the latter agreed to sell 25 shares of the common stock of a corporation known as Lakeshore Hi-Fi, Inc.[2] The said agreement consisted of two separate instruments executed at the same time, one entitled "Agreement of Sale" and the other designated as "Addendum to Agreement of Sale." The "Agreement of Sale" recites that the consideration was the sum of $15,000 "(more or less, as hereinafter provided)," subject to terms and conditions, among which is paragraph 1 which reads as follows: "Contemporaneously with the execution of this agreement, Hood & Strong, Accountants, Shell Building, San Francisco, California, shall undertake an audit of all the books and records of said Lakeshore Hi-Fi, Inc. If

---

[1]There are two corporate appellant plaintiffs in this case, i.e., Santa Clara Properties Co. and Hi Fidelity Enterprises, Inc. The former owns 51 per cent of the stock of the latter. The sale and contract in question was negotiated and consummated in the name of Hi Fidelity Enterprises, Inc. Both corporations will be hereinafter designated as "appellant."

[2]Said shares constituted 50 per cent of all the issued stock of said corporation which will hereinafter sometimes be referred to as "Lakeshore." The other 50 per cent was owned by Dan Strohl, hereinafter referred to as "Strohl."

the audit discloses that the book value of the shares purchased and sold hereby, as of July 31, 1959, exceeds Sixteen Thousand Dollars ($16,000.00), Buyer shall pay to Seller a sum equal to said excess. In the event the audit, adjusted for actual value of the fixed assets is less than Fourteen Thousand Dollars ($14,000.00), Seller shall pay to Buyer a sum equal to said deficiency.'' The agreement further recites that the seller accepts and acknowledges receipt of the sum of $15,000 subject to the conditions of said paragraph 1. The said ''Addendum to Agreement of Sale'' recites, among other provisions, that ''The agreement of sale entered into this 13th day of August, 1959, . . . is hereby amended as follows: 1. Paragraph No. 1 is corrected to read as follows: Seller represents that the attached balance sheet as of July 1, 1959, showing a Net Worth of $27,862.47, is substantially correct. Buyer is allowed a period of ten days (10 days) within which to examine the books and records of Lakeshore Hi-Fi, Inc., and should the Net Worth in their opinion be more or less than the amount shown on the attached balance sheet, buyer shall have the option of requesting a full refund of the $15,000.00 to be paid and hereby paid for the common stock being sold. In that event there is no obligation on either the part of the buyer to buy or on the part of the seller to sell the shares of stock referred to in this agreement.'' Attached to said addendum is a document designated ''Financial Statement as of July 31, 1959.'' This statement includes a ''Balance Sheet'' and a ''Statement of Income'' for specified periods of operation.[3] Concurrent with the execution of said instruments the sum of $15,000 was paid to respondent and the corporate records and the executed resignations of the previous officers of Lakeshore were delivered to appellant's attorney. Mr. Paine, president of both appellant corporations, thereupon requested Hood & Strong, the accountants, to make an audit of the books of Lakeshore within the 10-day period. He was informed by said accountants that a complete audit could not be completed in 10 days, but that they would get all the information they could within that time. No extension of the 10-day period was requested of respondent by appellant. On August 22, and within the said 10-day period, Paine received a report from Hood & Strong dated August 21, 1959, showing the ''adjusted net worth'' of Lakeshore

[3]For 10 months ending July 31, 1959, as to the ''San Francisco'' operation. For 3 months ending July 31, 1959, as to the ''Hayward'' operation.

to be $24,885.41, instead of $27,862.47 as shown on the July 31, 1959, statement aforesaid. No exercise of the option to return the stock was made or attempted at that time. In this regard Paine testified that after discussing the report with his attorney, Mr. Giometti, and Mr. Strohl, it was decided not to exercise the option to return the stock.[4] Mr. Giometti testified substantially to the same effect.[5] Along about the 10th to the 15th of September appellant started to receive statements from suppliers which indicated a balance due from Lakeshore for which there were no accounts payable on the books of Lakeshore. Paine testified that they were thus required to write to the suppliers for a breakdown of their account and for duplicate invoices, and that because some of the suppliers were in the East three or four weeks were consumed in this process. Paine testified further that the presentation of such statements for accounts not on the books continued throughout September and October; that there were so many of them that he discussed it with his attorney and it was thereupon determined to give a notice of rescission of the agreement. This notice was given by appellant to respondent on October 23, 1959. The instant action for rescission, or, in the alternative, for damages, was thereupon filed on November 18, 1959.

At or about the time this action was filed, Hood & Strong were instructed to make another audit which culminated in a report which was completed on December 4, 1959. This report disclosed that the net worth of Lakeshore was $15,377.64 and that it had a substantial loss for the year instead of a profit.[6] According to this last report the net worth in the July 31 balance sheet was overstated by $12,484.83, and was $9,507.77 less than the $24,885.41 net worth figure given by Hood & Strong on August 22d.

---

[4] "Q. Now, did you elect to accept this option and to return the stock based on that shortage? A. After discussing the report with Mr. Giometti and Mr. Strohl, studying it, we decided that the difference which was reflected in the net worth was unduly large, and that we wouldn't exercise our option to return the stock." (It is apparent that Paine intended to state that the difference was *not* unduly large.)

[5] "Q. Did you discuss this report with Mr. Paine, or was any action taken with respect to the purchased [*sic*] based on the report? A. Well, we discussed the report, and we felt that a difference of $3,000 would really be a difference of $1500, but on that basis we were still willing to continue and go ahead with it, so we didn't do anything."

[6] The financial statement of July 31, 1959, indicates a net profit of $6,466.07 for the San Francisco operation for the 10 months ended July 31, 1959, and a net loss of $1,047.23 for the Hayward operation for the 3 months ended July 31, 1959.

The complaint in the present action is in four counts: The first two counts sound in fraud and charge that false representations were made by respondent to appellant as to the financial condition of Lakeshore. Each of said counts asserts that these representations were relied upon by appellant and allege that upon discovery of the facts appellant rescinded. The first count differs from the second in that it alleges that the false representations were knowingly made. The third cause of action is predicated upon failure of consideration, and the fourth count is for money had and received. The answer of respondent denies generally the allegations of the complaint and by way of cross-complaint seeks a reformation of the agreement of sale on the basis of mistake in that when the addendum was drawn it did not reflect the agreement of the parties to the effect that the sale of the subject stock was made without any warranties, representations or promises on the part of respondent relative to the financial position of Lakeshore. The trial court adjudged that neither of the parties take anything by its respective action, it being the conclusion of the court below that no representations were made to appellant with reference to the financial condition of Lakeshore or the accuracy of the balance sheet, and that respondent has fully performed the terms and conditions of the agreement of sale and the addendum thereto.[7]

### Questions Presented

1. Did respondent make any representations to appellant as to the financial condition of Lakeshore?

2. Was it proper for the trial court to admit the extrinsic evidence on the issue as to whether such representations were made? If so, is there substantial evidence in the record to support the trial court's finding that no such representations were made?

3. If such representations were made, was appellant entitled to rely upon them? If appellant was entitled to rely on such representations, did it in fact rely upon them? If such representations were made and appellant was entitled to rely upon them is there substantial evidence in the record to support the trial court's finding that appellant did not rely on such representations?

---

[7]These are the essential facts necessary to place in focus the issues presented on this appeal. The facts pertinent to the respective questions and the trial court's findings with respect thereto will, where requisite to this opinion, be discussed in connection with the consideration of the particular question at issue.

## The Question of Ambiguity

In order to properly meet the issue as to whether representations were made we must consider the question of the interpretation of the agreement of sale.[8]     If the construction of the agreement is based upon its terms without the aid of extrinsic evidence, its construction is one of law and we are not bound by the trial court's interpretation. (*Estate of Platt*, 21 Cal.2d 343, 352 [131 P.2d 825]; *Meyer* v. *State Board of Equalization*, 42 Cal.2d 376, 381 [267 P.2d 257]; *Ziganto* v. *Taylor*, 198 Cal.App.2d 603, 606 [18 Cal.Rptr. 229]; *Estate of Black*, 211 Cal.App.2d 75, 83 [27 Cal.Rptr. 418].)     The basis of this rule is that where no extrinsic evidence has been considered there is no issue of fact, and, accordingly, the appellate court has the duty to make the determination in accordance with applicable principles of law. (*Estate of Black, supra*; *Meyer* v. *State Board of Equalization, supra*; *Estate of Platt, supra*.)     On the other hand, where it is a proper case for the admissibility of extrinsic evidence and such evidence has been received, the appellate court will accept or adhere to the interpretation adopted by the trial court where the parol evidence is such that conflicting inferences may be drawn therefrom. (*Estate of Rule*, 25 Cal.2d 1, 11 [152 P.2d 1003, 155 A.L.R. 1319]; *Munier* v. *Hawkins*, 190 Cal.App.2d 655, 663 [12 Cal.Rptr. 274]; *Transmix Corp.* v. *Southern Pac. Co.*, 187 Cal.App.2d 257, 269 [9 Cal.Rptr. 714]; *Estate of Black, supra*, p. 84; *Irey* v. *Len*, 191 Cal.App.2d 13, 18-19 [12 Cal.Rptr. 403].)     In the application of the latter rule, therefore, the question of its meaning is one of fact. (*Walsh* v. *Walsh*, 18 Cal.2d 439, 444 [116 P.2d 62]; *Irey* v. *Len, supra*; *Scott* v. *Sun-Maid Raisin Growers Assn.*, 13 Cal.App.2d 353, 359 [57 P.2d 148].)

The question of ambiguity in the case at bench is directed to paragraph 1 of the "Addendum" and the crux of the inquiry is directed to the meaning of the first two sentences of said paragraph. A considerable part of the evidence adduced by both parties was devoted to the discussions and circumstances surrounding the execution of both the original agreement of sale and the "Addendum" thereto. It is obvious from the trial court's findings of fact that such evidence

---

[8]Both parties have treated the two documents, i.e., the agreement of sale dated Auugst 13, 1959, and the addendum thereto as one instrument constituting the written agreement of sale between the parties, and we shall likewise consider them as such.

848

was considered by it in its interpretation of the agreement of sale.[9]

Appellant contends that the written contract is unambiguous, and contains the entire agreement of the parties and that the trial court should not have considered parol evidence surrounding the execution of the contract and what the parties intended it to mean. No objection was made by either party at any point in the trial to parol evidence. The only reference in the record to the parol evidence rule was by the trial court itself *after* both sides had rested their respective cases and during a colloquy between court and counsel with reference to the presentation of points and authorities.[10] Even then no objection was interposed to the parol evidence nor was any motion made to strike the same.

[9]The specific findings of fact are as follows:

"V

"That in July 1959 plaintiffs approached defendant for the purpose of purchasing said stock; that a course of negotiation occurred thereafter between plaintiffs and defendant in regard to such sale; that throughout said negotiations defendant refused to and did not warrant, represent, guarantee or make any promise in regard to the value of said stock or the financial situation of said corporation.

"VI

"That in the course of said negotiations, on August 13, 1959, a meeting was held between plaintiffs and defendant; that at said meeting, plaintiffs presented to defendant a document entitled 'Agreement of Sale,' which document is attached to and forms a part of Exhibit 'A' to the complaint herein; that defendant objected to the provisions of said document.

"VII

"That thereafter, at said meeting, it was orally agreed between plaintiffs and defendant as follows: That defendant would present to plaintiffs a balance sheet of said corporation as of July 31, 1959, without any warranty, representation, guaranty or promise as to the truth or accuracy of said statement; that plaintiffs would forthwith pay defendant the *sum of $15,000.00 cash for said stock;* that plaintiffs were to be allowed a period of ten days from August 13, 1959, within which to examine the books and records of said corporation; and, that should the net worth of said corporation in the opinion of plaintiffs be more or less than the amount shown on said balance sheet, within said ten days plaintiffs would have the option of requesting a refund of said sum of $15,000.00."

"IX

"That thereafter and at said meeting plaintiffs and defendant set about to modify said Agreement of Sale by the preparation of a written addendum thereto in order to express in writing the true agreement between plaintiffs and defendant on the particulars orally agreed upon as specified in Paragraph VII of these Findings."

[10]The trial court made this statement: "The Court is, of course, interested in two matters, and that is the question of the interpretation and modification of any agreement. Of course, we have the parol evidence rule that I am concerned with, but if counsel wish at any time to submit authorities, I would be happy to grant it. I am not limiting you to that particular phase, but that is the phase that primarily interests the court."

The objection is being made for the first time on this appeal. It should be noted from the record that not only did both parties choose to litigate the circumstances surrounding the execution of the contract and of the meaning of the contract and the addendum thereto, but the introduction of such evidence was initiated by appellant itself during the presentation of its case in chief.

The question whether the violation of the parol evidence rule can be raised for the first time on appeal has been the subject of conflicting views in this state. One view stresses the substantive nature of the rule; the other is based upon the fundamental policy which requires the raising of all issues in the lower court as a prerequisite to appellate review, and the principle that incompetent evidence admitted without objection may sustain a judgment. (See Witkin, Cal. Evidence, § 358, pp. 398, 399-400.) Under the former, parol evidence contradicting an integration erroneously admitted without objection should be disregarded on appeal as of no probative force in determining the sufficiency of the evidence to support the judgment. (*Dollar* v. *International Banking Corp.*, 13 Cal.App. 331, 343 [109 P. 499]; *Harding* v. *Robinson*, 175 Cal. 534, 540 [166 P. 808]; *Rottman* v. *Hevener*, 54 Cal.App. 474, 479 [202 P. 329]; *Middlecamp* v. *Zumwalt*, 100 Cal.App. 715, 723 [280 P. 1003]; *Hanrahan-Wilcox Corp.* v. *Jenison M. Co.*, 23 Cal.App.2d 642, 645 [73 P.2d 1241]; *Lifton* v. *Harshman*, 80 Cal.App.2d 422, 432 [182 P. 2d 222]; *El Zarape etc. Factory, Inc.* v. *Plant Food Corp.*, 90 Cal.App.2d 336, 344 [203 P.2d 13].) Under the latter view, the admission of parol evidence to vary or add to a written instrument cannot be objected to for the first time on appeal and such evidence may be considered in support of the judgment. (*Pao Ch'en Lee* v. *Gregoriou*, 50 Cal.2d 502, 505-506 [326 P.2d 135]; *Tsarnas* v. *Bailey*, 179 Cal.App.2d 332, 338 [3 Cal.Rptr. 629]; *Jacoby* v. *Wolff*, 198 Cal. 667, 676-677 [247 P. 195]; *Graham* v. *Smither*, 53 Cal.App.2d 701, 706 [127 P.2d 1024]; *Bonner* v. *Finney*, 110 Cal.App. 518, 521-522 [294 P. 466]; *Tennant* v. *Wilde*, 98 Cal.App. 437, 441-442 [277 P. 137]; *Inner Shoe Tire Co.* v. *Tondro*, 83 Cal.App. 689, 693-694 [257 P. 211]; *Caine* v. *Polkinghorn*, 54 Cal. App. 387, 390 [201 P. 936]; *McComish* v. *Kaufman*, 43 Cal. App. 507, 510 [185 P. 476].) *Pao Ch'en Lee* expressly disapproves *Lifton* v. *Harshman, supra*, 80 Cal.App.2d 422, but does not mention any of the other authorities supporting the first view. However, *Lifton* relies on all of the cases

cited above in support of the first view decided previous to its decision with the exception of *Harding. El Zarape etc. Factory,* in turn, relies upon *Lifton.* ▉ In view of the recent holding of *Pao Ch'en Lee* and its express disapproval of *Lifton,* there appears to be little question that the Supreme Court has put the conflict at rest and that it is now the settled law in California that the admission of parol evidence to vary or add to a written instrument cannot be objected to for the first time in the appellate court. ▉ Accordingly, we must consider the parol evidence adduced in the present case in ascertaining whether inferences can be drawn from the written agreement and the surrounding circumstances to support the trial court's finding relative to the intention of the contracting parties.

### The Question of Express Warranty

▉ Although appellant's complaint appears to sound in fraud and is based upon alleged false and fradulent representations, appellant states in its briefs that its case is predicated upon the theory that respondent made an express warranty regarding the balance sheet in question, that the balance sheet is false, and that if the balance sheet is false respondent is liable. Appellant contends that this warranty is expressly contained in the agreement of sale and the addendum; that it is a "warranty representation" on the part of respondent as to the financial condition of Lakeshore; and that such warranty exists as an independent covenant not in any way dependent upon the option to rescind. That express warranty is found, says appellant, in the first sentence of paragraph 1 of the addendum which reads as follows: "Seller represents that the attached balance sheet as of July 1, 1959, showing a Net Worth of $27,862.47, is substantially correct."

Notwithstanding the said language of the "Addendum," the trial court found: "That neither defendant nor any agent of defendant warranted, represented, guaranteed or made any promise whatsoever in regard to the value of said stock, the financial situation of said corporation, or the truth or accuracy of said balance sheet." In making this finding of fact and a conclusion of law therefrom in the same terminology, the trial court undoubtedly considered not only the written language of the addendum but also the extrinsic evidence adduced before the court without objection. This finding was, in our opinion, amply supported by such extrinsic

evidence which the trial court properly considered and which we must review for the purpose of ascertaining whether it is substantial.

The testimony of Edward Mencoff, respondent's accountant, Norman Krauss, its vice-president, and respondent's president, Morris Bernstein, is susceptible of inferences which establish the evidence that respondent did not intend to warrant the value of the stock or to make any representations as to its value or the financial condition of Lakeshore, and that this intention was understood by appellant and was orally assented to. During the conversations between the parties in the course of the negotiations, both prior to and immediately preceding the execution of the agreement of sale and the addendum thereto, several statements were made by both Krauss and Bernstein that they were only selling stock and that they were not making any warranties as to its value or the financial situation of Lakeshore. Thus we have testimony that Krauss stated: "that they were selling capital stock $15,000 on the stock; that "he didn't want the price to be in any way keyed to the net worth of the company"; that "we would not warrant any of the figures on any of the statements, because we wouldn't go into the books, plus the fact that anything could develop after, and still that we might not have any knowledge of"; that "I told Mr. Paine again that as far as I was concerned, the price was $15,000, and that I didn't want to reimburse the buyer for one-half of any liability"; that "We will not warrant any part of this." We also have the following testimony on the part of Krauss, which we set out verbatim.[11] Bernstein testified that he told

[11]"Q. I hand you Plaintiffs' Exhibit 2, which is the addendum to the agreement. Please tell the Court the circumstances surrounding the preparation of that agreement. A. Yes. After we discussed the—this agreement for the sale, Exhibit Number 1, and we got all the bugs, so to speak, ironed out, and we understood each other, Mr. Giometti called Mr. Paine long distance right from the office there and told him the problems. I think I even got on the phone. I repeated to him again, I said, 'As I told you before, $15,000 is the price; take it or leave it.' And we wouldn't warranty anything. Mr. Giometti talked to Mr. Paine, and he apparently agreed to accept it that way. So they—So they—He said, 'Let's write an addendum.' Q. Who said? A. Mr. Giometti, after he hung up, he said, 'Is there a girl around to type it?' I said, 'No one here, no girl today.' I said, 'That is no problem; I can wrap [sic] it out. You dictate it.' Q. All right. What happened in that, actually? A. As I recall, Mr. Giometti dictated the majority of this, I would say the very first paragraph and Paragraph Number 1. Q. The very first paragraph; you mean this introductory paragraph? A. Yes, the introductory, and so on, and the and were not selling assets"; that they had set a price of

Paine that "under no circumstances could we warrant the sale, or anything about the sale, or the stock itself"; and that he stated to Mr. Giometti, Paine's attorney, that "there were no warranties to go with this deal, and there should be no warranties." Bernstein gave other testimony which we also set out verbatim.[12]

### The Option to Rescind

A contract may contain a valid provision giving one or either party an option to rescind. (*Cline* v. *Smith*, 96 Cal.App. 697, 699 [274 P. 761]; *Brawley* v. *Crosby etc. Foundation, Inc.*, 73 Cal.App.2d 103, 118 [166 P.2d 392]; *Wooton* v. *Dorr*, 88 Cal.App.2d 781, 784 [199 P.2d 345]; *George J. Birkel Co.* v. *Howze*, 12 Cal.App. 645, 648 [108 P. 145]; *Gay* v. *Dare*, 103 Cal. 454, 459 [37 P. 466]; *Spaeth* v. *Ocean Park etc. Inv. Co.*, 16 Cal.App. 329 [116 P. 980]; *Hernan* v. *Our Lady's Home*, 32 Cal.App. 318 [162 P. 901]; *Phalanx Air Freight* v. *National etc. Freight*, 104 Cal.App.2d 771, 773 [232 P.2d 510]; *U. S. Propellers, Inc.* v. *Zenith Plastics Co.*, 187 Cal.App.2d 780 [10 Cal.Rptr. 137].) *Hernan, George J. Birkel Co., Gay, Spaeth* and *Wooten* recognize the validity of a provision in a contract giving one party the right to rescind where such party is dissatisfied. In *George J. Birkel Co., Gay* and *Spaeth*, we have transactions involving the sale of corporate stock. Both *George J. Birkel Co.* and *Gay* involved a transfer of stock for an agreed price accompanied by an agreement by the vendor to repurchase the stock on the demand of the vendee within a specified

---

Paragraph Number 1, that is marked Number 1, that is referred to as Paragraph Number 1—correction; and then this part two, as I recall, I think Mr. Mencoff put this wording into that. When it was completed, I signed it, and Mr. Giometti signed it, and we attached it to the other copies."

[12]"Q. Well, referring—I will hand you Plaintiffs' Exhibit Number 2, which you will note contains a substitution of the first paragraph of Plaintiffs' Exhibit 1. Does this bring to mind the discussion concerning price? A. I heard Norm insist that the price was $15,000, that he was selling stock; we weren't selling capital assets; we weren't selling anything except stock; and there were no further warranties with the deal. I didn't read that, and this is just about the first time I am reading this."

"Q. Was there any explanation at that meeting as to why there would be no warranties, as you testified? Did you discuss with Mr. Giometti why there would be no warranties? MR. ARGUELLO: If the Court please, I object to the question as asked and answered. MR. CAHEN: I think not, at the particular meeting. MR. ARGUELLO: It is my recollection—— THE COURT: I will permit it once more. THE WITNESS: A. There was a discussion on it, and then I believe Norm, Mr. Krauss, said something about the 10 days, you would have 10 days time in which to look the deal over and turn it down; he had the option of keeping the stock or returning it."

period of time at an agreed price with interest at a specified rate added. In upholding the validity of such a contract, *Gay* recognized the following rule (also quoted by *George J. Birkel Co.* at p. 648): ''[I]n all that class of cases where a purchaser of chattels pays the price, but stipulates that after a trial of the property purchased, or at some future time, he may, if he so desires, return the property and receive back the price paid, it is usually held that it does not amount in law to a contract to repurchase, but is, upon the exercise of the option, a rescission of the contract, and the title at once vests in the original vendor.''[13] (P. 459.) In *Spaeth*, the terms of a contract for the acquisition of shares of stock were determined to provide that the vendors and vendee agreed that if the vendee '' 'became dissatisfied or wanted his money back' '' the vendors promised to return to the vendee the sum paid by the latter for the stock. It was there held that the contract constituted a valid option to rescind the sale of the stock. (P. 330.)

When an option is given for a specified period it must be exercised within the period and if not accepted within the time prescribed, it expires by its own terms. (*Rosenaur* v. *Pacelli,* 174 Cal.App.2d 673, 676-677 [345 P.2d 102] ; *Wooten* v. *Dorr, supra; Rice Lands etc. Co.* v. *Blevins,* 61 Cal.App. 536, 541 [215 P. 402] ; 1 Witkin, Summary of Cal. Law, § 53, p. 60.) Accordingly, where a contract sets a limited time within which one party must elect to rescind, he will not be permitted to rescind it after the time specified has elapsed. (*Morganthaler* v. *Krieg,* 101 Cal.App. 436, 438-439 [281 P. 692] ; see *Champion G. Min. Co.* v.

---

[13]This principle has been included in the Uniform Sales Act. In California it is embodied in rule 3(1) of section 1739 of the Civil Code, which provides: ''Where goods are delivered to the buyer 'on sale or return,' or on other terms indicating an intention to make a present sale, but to give the buyer an option to return the goods instead of paying the price, the property passes to the buyer on delivery, but he may revest the property in the seller by returning or tendering the goods within the time fixed in the contract, or, if no time has been fixed, within a reasonable time.'' Although the Uniform Sales Act has been held not to apply in California to the sale of corporate stock (*Franck* v. *J. J. Sugarman-Rudolph Co.,* 40 Cal.2d 81 [251 P.2d 949]; *Porter* v. *Gibson,* 25 Cal.2d 506 [154 P.2d 703]), it has been held that the law governing contracts for the sale of shares of stock remains unchanged in this state by the enactment of the Uniform Sales Act. Accordingly, in dealing with sales of shares of corporate stock, reliance is placed upon the law of the sales of personal property as provided for in the Civil Code (other than as stated in the Sales Act) and as they existed before the Uniform Sales Act was adopted. (See *Porter* v. *Gibson, supra,* p. 514; *Franck* v. *J. J. Sugarman-Rudolph Co., supra,* p. 87.)

*Champion Mines,* 164 Cal. 205, 213-214 [128 P. 315].) On the other hand, if the agreement is silent as to the time for exercising the option, the optionee must exercise it within a reasonable time. (*Lohn* v. *Fletcher Oil Co., Inc.,* 38 Cal. App.2d 26, 31 [100 P.2d 505]; *Bergin* v. *van der Steen,* 107 Cal.App.2d 8, 13 [236 P.2d 613]; *Spaeth* v. *Ocean Park etc. Inv. Co., supra,* p. 331; 1 Witkin, Summary of Cal. Law, *supra.*) What is a reasonable time for the exercise of an option depends upon the facts and circumstances of the particular case. (*Lohn* v. *Fletcher Oil Co., Inc., supra,* p. 32; *Auslen* v. *Johnson,* 118 Cal.App.2d 319, 322 [257 P.2d 664]; see *Spaeth* v. *Ocean Park etc. Inv. Co., supra,* p. 331.)

In the case at bench the trial court found "[t]hat plaintiffs declined and failed to exercise the option to return said stock as provided in said agreement and said addendum thereto."[14] A reading of paragraph 1 of the "Addendum" discloses a patent ambiguity, i.e., one which appears on the face of the instrument itself. (*Payne* v. *Commercial Nat. Bank,* 177 Cal. 68 [169 P. 1007, L.R.A. 1918C 328]; *Estate of Black, supra,* 211 Cal.App.2d 75, 84.) It is difficult to comprehend from a reading of the sentence providing for the option to rescind whether it means that the option was required to be exercised within 10 days, or whether the buyer was allowed 10 days within which to examine the books and records and then had an option to rescind. In the latter case the buyer would have a reasonable time within which to rescind because no period therefor is specified. Although the general rule appears to be that when the ambiguity is patent parol evidence is inadmissible (see 18 Cal.Jur.2d §§ 275, 276, pp. 763-767; and see *Estate of Black, supra,* p. 84), it is also

---

[14]The other specific findings with reference to the option to rescind are as follows:

"XIII

"That within said ten (10) day period, plaintiffs investigated the books and records of said corporation and such investigation disclosed and plaintiffs learned that the book value as stated in said balance sheet should be reduced by the sum of $2,973.06; however, plaintiff was owed by said corporation an amount not reported in the balance sheet substantially in excess of $2,973.06.

"XIV

"That on July 31, 1959, said corporation had accounts payable to plaintiffs in the amount of $13,500.00; that of said amount the sum of $5,649.00 was not reflected on said balance sheet; that the existence of said amount of $13,500.00 was disclosed in the financial records of plaintiffs during said ten (10) day period and immediately prior thereto; that at no time during the said ten (10) day period or prior thereto did plaintiffs compare their financial records regarding said sum of $13,500.00 with said balance sheet or with the financial records of said corporation as they stood from time to time during said time."

apparent that the later cases in this state hold that extrinsic evidence is admissible to explain patent ambiguities as well as ambiguities which are latent. (*Estate of Torregano*, 54 Cal.2d 234, 246 [5 Cal.Rptr. 137, 352 P.2d 505]; *Estate of Black, supra; Neff* v. *Ernst*, 48 Cal.2d 628, 635 [311 P.2d 849]; *City of Redlands* v. *Nickerson*, 188 Cal.App.2d 118, 125 [10 Cal.Rptr. 431].) As we have pointed out above, however, we are not here concerned with the admissibility of extrinsic evidence because such evidence was admitted without objection. It is apparent from the trial court's findings that such extrinsic evidence was considered by the court below. The findings by the trial court did not express the option to rescind as one for a fixed period, i.e., one that was required to be exercised within 10 days, but it is clear from the record that such is the meaning of the findings. ▆▆▆ These findings will, of course, be construed in support of the judgment if that can reasonably be done. (*City of Napa* v. *Navoni*, 56 Cal.App.2d 289, 294 [132 P.2d 566]; *Townsend* v. *Wingler*, 114 Cal.App.2d 64, 68-69 [249 P.2d 613]; *Anderson* v. *Pastorini*, 117 Cal.App.2d 428, 431 [255 P.2d 855]; *Peterson* v. *Allstate Ins. Co.*, 164 Cal.App.2d 517, 520 [330 P.2d 843].)

We now turn to the record to ascertain whether the evidence is sufficient to sustain the trial court's findings that the option to rescind was limited to the 10-day period and that it was not exercised within said period. The record not only supports the finding that no attempt was made to exercise the option within the 10-day period, but this is conceded by appellant. In fact the record discloses that the first notice of rescission was given on October 23, 1959, i.e., 61 days after the expiration of the 10-day period mentioned in the addendum. It should be noted, moreover, that although the said notice of rescission has not been made a part of the record, appellant's complaint alleges that said notice of rescission was predicated upon the statutory rescission provided for in section 1689, subdivision (b), of the Civil Code based upon fraud and failure of consideration and not upon the exercise of an option to rescind specifically provided for in the agreement of sale.

▆▆▆ Assuming, *arguendo*, that such a notice would have sufficed as a notice to rescind pursuant to the terms of the agreement of sale it was not timely made because not exercised within the 10-day period. There was substantial evidence in the record to indicate that it was the understand-

ing and agreement of the parties that if such option was to be exercised at all it was necessary that it be put into action within 10 days from August 13, 1959. Paine testified that after the addendum was executed, and on the same day of its execution, his attorney, Giometti, told him "that we had 10 days in which we could call the deal off if we wanted to." He also testified: "The following morning I called Hood & Strong, the auditors, and asked them if they could rush this audit, because we had an option for 10 days to set the deal aside." Moreover, Paine's understanding that the option was to be exercised within the 10 days is evidenced by the testimony we have hereinbefore alluded to that he discussed with his attorney whether they should exercise the option after receiving the first report from Hood & Strong and it was decided that they would not do so. There is certain testimony adduced from Krauss that Giometti handed him a check for signature representing a bonus due an employee of Lakeshore, whereupon Krauss stated to Giometti "Well, why would we give him this now? We don't know if Mr. Paine might decide within the 10 days that he is going to turn this back, and we don't want to give him this at this time." We have already alluded to Bernstein's testimony wherein Krauss stated to Giometti "you would have 10 days time in which to look the deal over and turn it down; . . ." Giometti did not testify as to any of the conversations having to do with the 10-day period, but merely stated that he participated in the drafting of the language referring to it in the "Addendum." There was also a conflict in the testimony as to whether he or Krauss drafted the option clause. Mencoff's testimony, on the other hand, was to the effect that it was agreed that "they would have 10 days within which to examine the records, and if they weren't satisfied, that his net worth was to their satisfaction, they had the option of returning it and getting their money back." Mencoff testified further: ". . . I think the remainder of the paragraph was essentially Mr. Krauss' wording, because he was the one that was allowing 10 days within which to examine the books."

▮▮▮ The evaluation and reconciling of any conflicts or inconsistencies was, of course, for the trial court and we are not called upon to reweigh the evidence as long as there is a conflict of substantial evidence upon the controlling issue or issues. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *Florez* v. *Groom Development Co.,* 53 Cal.2d 347, 354 [1 Cal.Rptr. 840, 348 P.2d 200].)

### *The Trial Court's Determination*

It is our conclusion, therefore, that the trial court's findings that no representations or warranties or promises were made by respondent in regard to the value of the stock, the financial situation, or the truth or accuracy of the said balance sheet, and that appellant did not exercise its right to rescind within the time specified in the agreement of sale, are sustained by substantial evidence. Accordingly, the judgment must of necessity be affirmed.

The briefs of respective counsel have also touched upon the question of reliance. Appellant contends that there is substantial evidence in the record that they were entitled to rely and did rely on the express warranty or representation of respondent. The court below made a specific finding to the contrary,[15] and also made some reference in its findings to the fact that appellant had knowledge of substantial amounts due it from Lakeshore, which did not appear on Lakeshore's books, during said 10-day period and immediately prior thereto. Such findings, however, are not necessary to the judgment. If no warranties, representations or promises were in fact made, it necessarily follows that there was nothing upon which a reliance could be predicated. The issue of reliance is therefore moot and it is not necessary for us to discuss it.

The judgment is affirmed.

Bray, P. J., and Sullivan, J., concurred.

---

[15]The trial court found as follows:

"XIX

"That plaintiffs did not and were not entitled to rely upon any warranty, representation, guaranty or promise whatever by defendant or any agent of defendant relevant to the value of said stock, the financial situation of said corporation or the truth or accuracy of said balance sheet."